David H. Leigh, Esq. (Wyo. Bar No. 6-4498)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, 14th Floor
P.O. Box 45385
Salt Lake City, Utah  84145-0385
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543
E-mail:  dleigh@rqn.com

Attorneys for KOMATSU FINANCIAL LIMITED PARTNERSHIP

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re:<br><br>**GRASS CREEK COAL COMPANY,**<br><br>Debtor. | Bankruptcy No. 15-20246<br><br>Chapter 7<br><br><br>(Filed via ECF) |

---

### STIPULATION FOR ENTRY OF ORDER TERMINATING AUTOMATIC STAY AND RESOLVING MOTION TO MODIFY STAY RELATING TO EXCAVATOR FILED BY SPRING GULCH COAL CO. AND OBJECTION TO MOTION FILED BY KOMATSU FINANCIAL LIMITED PARTNERSHIP

---

Grass Creek Coal Company, the debtor (the "Debtor") in the above-captioned Chapter 7 bankruptcy case (the "Bankruptcy Case"); Komatsu Financial Limited Partnership ("Komatsu"), a secured creditor of the Debtor; Spring Gulch Coal Co. ("SGC"), a secured creditor of the Debtor; and Randy L. Royal, the duly appointed Chapter 7 Trustee in the Bankruptcy Case (the "Trustee" and, together with the Debtor, Komatsu, and SGC, the "Parties"), by themselves or through their respective counsel, hereby stipulate and agree as follows:

1351088

## RECITALS

1.     Komatsu is a secured creditor of the Debtor with its claim secured by a purchase money security interest in that certain 2008 Komatsu PC 300LC-8 Hydraulic Excavator, Serial No. A90548, with 48" bucket, complete with all present attachments, accessories, and replacement parts (collectively, the "Excavator"), pursuant to that certain *Security Agreement—Conditional Sales Contract,* UCC-1 Financing Statement, and related purchase, loan and security documents (collectively, the "Purchase Agreement"), copies of which, evidencing the creation, attachment, and perfection of Komatsu's interest in the Excavator, are attached hereto as Exhibit A and incorporated herein by this reference.

2.     Komatsu's lien against the Excavator secures the repayment by the Debtor of its contractual obligations to Komatsu under the Purchase Agreement.

3.     The Purchase Agreement is currently in default.

4.     The current value of the Excavator is uncertain and depends on several factors including, but not limited to, the physical condition of the Excavator and market demand.

5.     The value of the Excavator is continuing to depreciate through use and/or the passage of time.

6.     On or about September 16, 2015, SGC filed its *Amended Motion to Modify Stay and Notice of Time to Objection* (the "SGC Motion").

7.     In the SGC Motion, SGC also asserts a security interest in the Excavator and alleges that its interest in the Excavator arises out of and relates to a certain *Promissory Note* and *Security Agreement*, signed by the Debtor in favor of SGC, a copy of which, along with additional purchase, loan, and security documents (together, the

2

"SGC Loan Agreement"), copies of which evidence the creation, attachment, and perfection of SGC's interest in the Excavator, are attached hereto as Exhibit B and incorporated herein by this reference.

8.      On or about October 6, 2015, Komatsu filed an objection (the "Objection") to the SGC Motion in the Bankruptcy Case arguing, among other things, that its purchase money security interest constitutes a first-priority interest in the Excavator senior to any interest held by SGC in the Excavator.

## AGREEMENT

9.      The Parties stipulate and agree that the foregoing recitals are true and correct to the best of their information, knowledge, and belief.

10.      Pursuant to 11 U.S.C. § 362(d)(1), Federal Rule of Bankruptcy Procedure 4001(d), and the Local Rules of this Court, the Parties stipulate and agree that Komatsu's interest in the Excavator is not adequately protected.

11.      Pursuant to 11 U.S.C. § 362(d)(1), Federal Rule of Bankruptcy Procedure 4001(d), and the Local Rules of this Court, the Parties stipulate and agree that SGC's interest in the Excavator is not adequately protected.

12.      Pursuant to 11 U.S.C. § 362(d)(2), the Parties stipulate and agree that the Excavator is not necessary for the Debtor's reorganization and that there is no equity in the Excavator that could be used for the Debtor's general unsecured creditors.

13.      SGC agrees that Komatsu has the senior interest in the Excavator.

14.      The Parties each hereby stipulate and agree that the Court may enter an Order (i) approving this Stipulation; (ii) granting the SGC Motion as it relates to the Excavator; and (ii) terminating the automatic stay as it relates to Komatsu and SGC and the Excavator and authorizing Komatsu and SGC each to foreclose upon, sell, or

otherwise liquidate their respective interests in the Excavator pursuant to applicable non-bankruptcy law without further notice or hearing.

15.    The Debtor hereby agrees to immediately (within three (3) business days) surrender the Excavator to Komatsu or its designated representative(s) following the entry of any Order approving this Stipulation and terminating the automatic stay.

16.    Komatsu further agrees, to the extent any surplus sale proceeds (the "Excess Sale Proceeds") remain following its sale, liquidation, or other disposition of the Excavator—and after applying such sale proceeds to Komatsu's total claim against the Debtor (calculated as (a) the balance due and owing by the Debtor under the Purchase Agreement as of the Petition Date; (b) any post-petition interest, fees, and other charges incurred as allowable under the Purchase Agreement, including, but not limited to, any asset recovery, repair, and/or sale costs; and (c) Komatsu's reasonable attorneys' fees and costs incurred in this matter and in otherwise attempting to enforce Komatsu's rights and remedies under the Purchase Agreement (collectively, the "Komatsu Claim Balance")—to remit the Excess Sale Proceeds to SGC within sixty (60) days following any sale, liquidation, or other disposition of the Excavator.

17.    SGC hereby agrees to apply the Excess Sale Proceeds to the balance of its claim against the Debtor, including any reasonable post-petition interest, fees, and costs incurred by SGC in this matter, including, but not limited to, any and all reasonable attorneys' fees and costs incurred by SGC in this matter and in attempting to enforce its rights and remedies under the SGC Loan Agreement, all to the extent allowed under the SGC Loan Agreement, and to thereafter remit to the Trustee the remaining Excess Sale Proceeds (the "Remaining Sale Proceeds"), if any.

18.     The Parties further stipulate and agree that the Court's Order terminating the automatic stay may take effect immediately, and that the fourteen (14) day stay period set forth in Federal Rule of Bankruptcy Procedure 4001(a)(3) need not apply.

19.     A proposed Order approving this Stipulation and terminating the automatic stay as set forth herein is filed contemporaneously herewith.

DATED this 13th day of April, 2016.

RAY QUINNEY AND NEBEKER P.C.

/s/ David H. Leigh
David H. Leigh
Attorneys for Komatsu Financial Limited
Partnership

DATED this 13th day of April, 2016.

ERIC NELSON, ATTORNEY AT LAW

/s/ Eric Nelson
Eric Nelson
Attorneys for the Debtor
(Signed by Filing Attorney with
Permission from Counsel)

DATED this 13th day of April, 2016.

/s/ Randy L. Royal
Randy L. Royal
Chapter 7 Trustee
(Signed by Filing Attorney with
Permission from Counsel)

DATED this 13th day of April, 2016.

FRANK B. WATKINS, P.C.

/s/ Frank B. Watkins
Frank B. Watkins
Counsel for Spring Gulch Coal Co.
(Signed by Filing Attorney with
Permission from Counsel)

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of April, 2016, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which sent notice of

electronic filing to the following:

- Eric K. Nelson, ericnelsonwyo@gmail.com
- Randy L. Royal:  rlroyal@randylroyalpc.com
- Daniel J. Morse:  daniel.j.morse@usdoj.gov
- Frank B. Watkins:  fwatkins@wyoming.com

I hereby further certify that on the 13th day of April, 2016, I caused a true and

correct copy of the foregoing to be served on the following parties by depositing a copy

of the same in the United States mail, first-class postage prepaid, addressed as follows:

Grass Creek Coal Company
P.O. Box 876
Lovell, Wyoming 82431

<u>EXHIBIT A</u>
(Purchase Agreement)

**KOMATSU FINANCIAL**      SECURITY AGREEMENT - CONDITIONAL SALES CONTRACT      ACCOUNT NO.

Subject to the Terms and Conditions herein contained, the Seller hereby agrees to sell, and the Buyer having been quoted and offered both a cash sale price, payable immediately or within a limited number of days, and a contract time price which permits the Buyer to purchase the property now but pay in installments over an extended period of time, hereby agrees to buy, the following described property ("property") on a contract time price basis set forth below. The Contract time price is more than the cash sale price because it includes charges by the Seller for having to wait a period of time before collecting its full purchase price and for taking a risk in waiting such period of time. The property is to be used only for commercial or business purposes, includes all accessories and attachments, and shall, except as permitted by Paragraph 7 on page 4 hereof, be located at Buyer's Address set forth immediately below.

| Seller's Information | MODERN MACHINERY CO., INC.<br>P.O. BOX 16660<br>MISSOULA, MT 59808 | | Quote No. | 38399 |
|---|---|---|---|---|

| Buyer's Information<br>GRASS CREEK COAL COMPANY<br>2223 Hwy 310, PO Box 876<br>LOVELL, WY 82431 | | Physical Location | 2223 Hwy 310, PO Box 876<br>LOVELL, WY 82431 |
|---|---|---|---|
| | | County:<br>State Charter Number:<br>State of Registration:<br>Tax ID: | BIG HORN<br>2004-000488021<br>WY<br>20-1193890 |
| County<br>Telephone: | BIG HORN | | |

**Property Description**

| Make | Model | Type | Description | Serial No. | Price |
|---|---|---|---|---|---|
| Komatsu | PC300LC-8 | Hydraulic Excavator | Equip # 24033 w/ 48" Bucket | A90548 | $195,000.00 |

**Trade-In Description**

| Year | Make | Model | Type | Description | Serial No. | Allowance | Amt. Owed | Net Trade |
|---|---|---|---|---|---|---|---|---|

| Schedule of Payments | Statement of Transaction | |
|---|---|---|
| BUYER AGREES TO PAY SELLER, OR IF THIS CONTRACT IS ASSIGNED, TO ASSIGNEE OF SELLER, THE TOTAL OF PAYMENTS (ITEM 10) IN ACCORDANCE WITH THE FOLLOWING SCHEDULE. PAYMENTS IN NUMBER AND AMOUNT ARE DUE EACH SUCCESSIVE MONTH ON THE SAME DAY AS THE STARTING DATE, OR AS INDICATED BELOW. | 1. Sales Price | $195,000.00 |
| | 2. Delivery, Installation, Repair (or other Service Charges) | $0.00 |
| | 3. Sales Tax | $5,250.00 |
| | 4. Cash Price (1+2+3) | $200,250.00 |
| Payments   Start Date   End Data   Payment   Total<br>48   03/23/2012   02/23/2016   $2,787.84   $133,816.32 | 5. a. Cash Down Payment | $76,048.00 |
| | b. Net Trade In | $0.00 |
| | c. Less Insurance | $0.00 |
| | Total Down Payment (5a-5b-5c) | $76,048.00 |
| Total of Payments   $133,816.32 | 6. Net Cash Price (4-5) | $124,202.00 |
| | 7. a. Lien & Filing Fees | $0.00 |
| | b. Other Fees | $500.00 |
| | Total Other Charges | $500.00 |
| | 8. Amount Financed (6 + 7) | $124,702.00 |
| | 9. Finance Charge (3.50%) | $9,114.32 |
| | 10. Total of Payments (8 + 9) | $133,816.32 |
| Date finance charge begins to accrue (if different than contract date) | 11. Total Time Price (4 + 7 + 9) | $209,864.32 |

RECEIVED
MAR   2 2012

KF62AR (12/10)
Page 1 of 3            ORIGINAL FOR SELLER (IF ASSIGNED, FOR KOMATSU FINANCIAL LIMITED PARTNERSHIP)        Buyer's Initials

# KOMATSU FINANCIAL

## SECURITY AGREEMENT - CONDITIONAL SALES CONTRACT

ACCOUNT NO.

| Insurance Coverage | Buyer Place of Business and Other Buyer Information |
|---|---|
| **LIABILITY INSURANCE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGE CAUSED TO OTHERS IS NOT INCLUDED IN THIS AGREEMENT.** | IF BUYER'S ACTUAL CHIEF PLACE OF BUSINESS (CHIEF EXECUTIVE OFFICE IF MORE THAN ONE PLACE OF BUSINESS) IS IN A STATE OTHER THAN STATE WHERE THE PROPERTY IS LOCATED (AS SET FORTH ON PAGE 1), SPECIFY ACTUAL CHIEF PLACE OF BUSINESS. |

Physical Damage Insurance Covering The Property Is Required.

BUYER HAS OBTAINED INSURANCE THROUGH THE INSURANCE AGENCY LISTED BELOW OR ON FORM KF543R, SUBMITTED WITH THIS CONTRACT.

Physical Location:

Insurance Agency  The McCoy Agency
130 S Brooks St.
Sheridan, WY 82801

Contact:
Phone#  1-307-672-2303

BUYER DOES NOT HAVE PLACES OF BUSINESS IN MORE THAN ONE COUNTY IN THE STATE WHERE PROPERTY IS LOCATED.

THIS SALE IS CONTINGENT UPON FINANCING ON TERMS WHICH ARE SATISFACTORY TO THE PARTIES.

IF DATE OF DELIVERY IS DIFFERENT THAN EFFECTIVE DATE SHOWN BELOW, SHOW ACTUAL DELIVERY DATE:

Partner Names and Addresses (if applicable)

| Name | Address | Tax ID |
|---|---|---|

**Delinquency Charge:** After maturity, each installment shall bear charges at the highest rate permitted by law, but not to exceed 1.5% per month. Buyer also agrees to pay all expenses, including reasonable attorneys' fees, incurred in the collection and enforcement, by suit or otherwise, of any amount payable under this contract.

**Security Interest:** In order to secure payment of the indebtedness contained herein or incurred hereunder, Seller hereby retains, and Buyer hereby grants, a purchase money security interest under the Uniform Commercial Code in and to the above described property sold hereunder, together with all replacements, substitutions, additions, attachments, repairs, accessions and proceeds, including amounts payable under any insurance policies with respect thereto. Buyer hereby authorizes Seller to file one or more financing statements and/or a carbon or reproduction of this contract as a financing statement. Buyer hereby authorizes Seller or its agent or assigns to sign and execute on its behalf any and all necessary UCC-1 forms to perfect the security interest herein granted to Seller.

**Location of Property:** Buyer and Seller agree that regardless of the manner of affixation, the property shall remain personal property and not become part of the real estate. Except as permitted by Paragraph 7, Buyer agrees to keep the property at the location set forth herein, and will notify Seller promptly in writing of any change in the location of the property within such State, but will not remove the property from such State without the prior written consent of Seller (except that in the State of Pennsylvania, the property will not be moved from the above location without such prior written consent).

**ENTIRE AGREEMENT:** BUYER agrees that this contract including the ADDITIONAL TERMS AND CONDITIONS PRINTED ON Page 3-5 hereof, which he has read and to which he agrees, contains the entire agreement relating to the conditional sale of the property and supersedes all previous contracts and agreements between Buyer and Seller relating to the order or sale of the property. This contract is not binding upon Seller, unless signed by the manager of Seller or owner.

**NOTICE TO BUYER:** 1. Do not sign this contract before you read it or if it contains blank spaces. 2. You are entitled to an exact and completely filled-in copy of the contract you sign. 3. Under law, you have the following rights, among others: (a) to pay off in advance the full amount due and obtain a partial refund of any unearned finance charge; (b) to redeem the property if repossessed for a default; and (c) to require, under certain conditions, a resale of the property if repossessed. 4. If you desire to pay off in advance the full amount due, the amount of the refund you are entitled to, if any, will be furnished upon request. 5. Keep this contract to protect your legal rights.

### BUYER ACKNOWLEDGES RECEIPT OF AN EXACT COPY OF THIS CONTRACT SIGNED BY SELLER

| | |
|---|---|
| Buyer:  GRASS CREEK COAL COMPANY | Effective Contract Date:  02/23/2012 |
| By: _(signature)_   Title  President | Salesman's Signature: |
| Co-Signer: _(signature)_   Sec./Treas. | Signature For Seller Approval: _(signature)_ |
| By: _____ Title: | |

ORIGINAL FOR SELLER (IF ASSIGNED, FOR KOMATSU FINANCIAL LIMITED PARTNERSHIP)

Buyer's Initials _(initials)_

**KOMATSU FINANCIAL**        SECURITY AGREEMENT - CONDITIONAL SALES CONTRACT

ACCOUNT NO.
_____

**Conditional Terms and Conditions:**

**1. Assignment by Seller; Waiver of Defenses Against Assignee Holder:**

Seller may hold this contract or it may assign it for value to Komatsu Financial Limited Partnership (hereinafter referred to as "KF"). If Seller does in fact assign this contract to KF then such assignment; a) KF as assignee, shall have all the rights and remedies of Seller hereunder and all of Buyer's agreements, representations and warranties shall be deemed to have been made to KF with the same force and effect as if KF were an original party hereto; b) Seller shall not be KF's agent for any purposes; c) Seller shall not have any power or authority to change or modify this contract or any related document or instrument in any way (except any relevant warranty or service agreement which is exclusively between Seller and Buyer and shall not bind KF or affect any of Buyer's or KF's rights or obligations under this contract); d) Buyer will settle all claims, defenses, set-offs and counterclaims of any nature, it may have against Seller, including but not limited to delivery of property, defects in the property and the like, directly with Seller, and not set up any such claim, defense, set-off or counterclaim against KF. Seller hereby agreeing to remain responsible therefor.

**2. Waiver of Defenses Acknowledgment; Place of Payment:**

Buyer acknowledges that: KF has no knowledge or information as to the condition or suitability for Buyer's purposes of the property, and KF's decision to purchase this contract from Seller, if so offered, will be made in reliance on Buyer's warranties, agreements and covenants herein, including Buyer's express agreement not to assert against KF any claims, defenses, set-offs or counterclaims it may now or in the future have against Seller earned on page 1 hereof. If this contract is assigned to KF then after assignment to KF, Buyer will make all payments directly to KF at such places as KF may from time to time designate in writing to Buyer.

**3. Buyer's Warranties and Representations:**

Buyer warrants, represents and covenants; a) that Buyer is justly indebted to Seller for the full amount of the foregoing indebtedness; b) that except for the security interest granted hereby the property is free from and will be kept free from all liens, claims, security interests and encumbrances; c) that no financing statement covering the property or any proceeds is on file in favor of anyone other than Seller but if such other financing statement is on file, it will be terminated or subordinated; d) that all information supplied and statements made by Buyer in any financial, credit or accounting statement or application for credit prior to, contemporaneously with or subsequent to the execution of this contract with respect to this transaction are and shall be true, correct, valid and genuine; e) Buyer has full authority to enter into this contract and in so doing it is not violating any law or regulation or agreement with third parties, and it has taken all such action as may be necessary or appropriate to make this contract binding upon it; f) No director, officer or employee of the Company is or has been identified on any of the following documents: (i) the United States Department of Treasury, Office of Foreign Assets Control ("OFAC") list of "Specially Designated Nationals and Blocked Persons" ("SDNs"); (ii) the United States Department of Commerce, Bureau of Industry and Security of "Denied Persons List", "Entity List" or "Unverified List"; (iii) the Directorate of Defense Trade Controls of the United States Department of State "List of Statutorily Debarred Parties" or "List of Administratively Debarred Parties"; (iv) the United Kingdom's "Consolidated List of Financial Sanctions Targets" as maintained by HM Treasury; (v) Canada's "Listed Entities" pursuant to the Charter of the United Nations Act 1945 and Charter of the United Nations Department of Foreign Affairs and Trade "Consolidated List" (pursuant to the Charter of the United Nations Act 1945 and Charter of the United Nations Terrorism and Dealings with Assets) Regulations 2002, as amended; (vi) the United Nations Security Council "Consolidated List" established and maintained by the 1267 Committee; or (vii) European Union Commission "Consolidated list of persons, groups and entities subject to EU financial sanctions". The Company is not and has not been involved in business arrangements or transactions with or involving countries subject to economic or trade sanctions imposed by the United States Government, or with or involving SDNs, in violation of the regulations maintained by OFAC.

**4. Events of Default; Acceleration:**

A very important element of this contract is that Buyer make all its payments promptly as agreed upon. Also essential is that the property continue to be in good condition and adequate security for the indebtedness. The following are events of default under this contract which will allow Seller to take such action under this Paragraph and under Paragraph 6 as it deems necessary:

(a)   any of Buyer's obligations to Seller under any agreement with Seller is not paid promptly when due;
(b)   Buyer breaches any warranty or provision hereof, or of any other instrument or agreement delivered by Buyer to Seller in connection with this or any other transaction;
(c)   Buyer dies, becomes insolvent or ceases to do business as a going concern;
(d)   it is determined Buyer has given Seller false information of a substantial nature regarding its financial condition;
(e)   any of the property is lost or destroyed;
(f)   a petition in bankruptcy or for arrangement or reorganization be filed by or against Buyer or Buyer admits its inability to pay its debts as they mature;
(g)   property of Buyer be attached or a receiver be appointed for Buyer;
(h)   whenever Seller in good faith believes the prospect of payment or performance is impaired or in good faith believes the property in insecure;
(i)   any guarantor, surety or endorser for Buyer defaults in any obligation or liability to Seller or any guaranty obtained in connection with this transaction is terminated or breached.

If Buyer shall be in default hereunder, the indebtedness herein described and all other debts then owing by Buyer to Seller under this or any other present or future agreement shall, if Seller so elect, become immediately due and payable.

This acceleration of all indebtedness, if elected by Seller, shall be subject to all applicable laws, including laws as to rebates and refunds of unearned charges.

**KOMATSU
FINANCIAL**    SECURITY AGREEMENT - CONDITIONAL SALES CONTRACT    ACCOUNT NO. _____

**5. Seller's Remedies After Default; Consent to Enter Premises:**

So long as any obligations are owed by Buyer to Seller hereunder, Seller shall have all the rights and remedies provided by this contract and provided by a secured party under the Uniform Commercial Code and any other applicable law. After default by Buyer, Seller's rights and remedies include but are not limited to a number of choices. Buyer acknowledges that if it defaults Seller is justly entitled to do whatever the law allows to avoid loss to itself and also to obtain for itself the benefit of the bargain under this contract.

Consequently, Buyer agrees that Seller, among its other rights and remedies, may itself or through its agent enter the premises or upon the land where the property is located and without removing the property render any equipment which is part of the property unusable and/or take possession of the property without notice to anyone or without judicial process of any kind, provided such self-help is done without breach of the peace (meaning actual or threatened violence to a person at the time of repossession). In order to afford itself of these and related remedies, Seller must be able to enter the premises or land in or upon which the property is located.

Buyer therefore agrees that Seller by itself or through its agent may without notice to any person and without judicial process of any kind, enter into any premises or upon any land (including access roads and rights of way) owned, leased or otherwise under the real or apparent control of Buyer or any agent of Buyer where the property may be or where Seller believes the property may be, and using any reasonable force with respect to the property and any property connected to the property, disassemble, render unusable, disconnect and separate all property from any other property and/or repossess and remove all or any item of the property.

Buyer will not hinder or delay Seller or its agent in any way and will, if requested, assist Seller or its agent in disassembling and/or removing the property. Seller may require Buyer to assemble the property and return it to Seller at a place to be designated by Seller which is reasonably convenient to both parties. Buyer expressly waives all further rights to possession of the property after default and all claims for damages related to such removal, disassembling, entering and/or repossession. The security interest granted hereby shall continue effective irrespective of any retaking and redelivery of the property to Buyer until all amounts secured hereby are fully paid in money.

Unless Buyer otherwise agrees in writing after default and unless the property is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Seller will give Buyer reasonable notice of the time and place of any public sale of the property or reasonable notice of the time after which any private sale or other intended disposition thereof is to be made. Unless otherwise provided by law, the requirement of reasonable notice shall be met if such notice is mailed, postage prepaid, to the address of Buyer shown herein at least ten days before the time of the sale or disposition. Expenses of retaking, holding, preparing for sale, selling and the like shall include reasonable attorneys' fees and other legal expenses. Buyer understands that Seller's rights are cumulative and not alternative and that Buyer will remain fully liable for any deficiency remaining after disposition of the property.

**6. Waiver of Defaults; Exclusive Agreement:**

Seller may in its sole discretion waive a default or cure a default at Buyer's expense. Any such waiver in a particular instance or of a particular default shall not be a waiver of other defaults or the same kind of default at another time. No modification or change in this contract shall bind Seller (after assignment, "Seller", as stated above means "KF") unless in writing signed by Seller. No oral agreement shall be binding.

**7. Buyer's Agreements:**

Buyer agrees; a) to defend at Buyer's own cost any action, proceeding or claim affecting the property; b) to pay reasonable attorneys' fees and other expenses incurred by Seller in enforcing its rights after Buyer's default: c) to pay promptly all taxes, assessments, license fees and other public or private charges when levied or assessed against the property or this contract and this obligation shall survive the termination of this contract; d) that if a certificate of title be required or permitted by law, Buyer shall obtain such certificate with respect to the property, showing the security interest of Seller thereon, and in any event do everything necessary or expedient to preserve or perfect the security interest of Seller; e) that Buyer will not misuse, fail to keep in good repair, secrete, or, except as provided in the remaining sentences of this Paragraph 7, without the prior written consent of Seller, and notwithstanding Seller's claim to proceeds, sell, rent, lend, encumber or transfer any of the property; f) that Seller may enter upon Buyer's premises or wherever the property may be located at any reasonable time to inspect the property. Buyer may lease the property in the ordinary course of Buyer's business and, in each instance, only on an arm-length basis upon the terms hereinafter set forth. In the event that Buyer leases the property to an affiliate of Buyer, the lease agreement between Buyer and such affiliate shall provide that such lease agreement is subordinate to this Contract.

To further secure payment of the indebtedness contained herein or incurred thereinafter, Buyer agrees to assign and hereby pledges, assigns and grants to Seller a security interest in the following collateral (collectively called "Additional Collateral"); all leases of the Property ("Leases"), other chattel paper, accounts, contract rights, documents, instruments and general intangibles, including all guaranties thereof, now existing or hereafter arising with respect to the Property (collectively with the Leases called the "Documents"); all rental payments and other amounts due or to become due under the Documents and all other cash and non-cash proceeds of the Property and the Documents (collectively called "Revenues"); all rights under and benefits of the terms, covenants and provisions of the Documents; and all legal and other remedies available for enforcement of the terms, covenants and provisions of the Documents. No Lease shall relieve Buyer of any of its obligations to Seller under Contract, and the aforesaid assignment of and security interest granted in the Documents and other Additional Collateral shall not be construed as authorizing Buyer to do anything with the Property other than to lease the same in accordance with the terms of this Contract. Buyer agrees that Seller does not, by this Contract or otherwise, assume any of the obligations of Buyer under any Lease or other Documents. Buyer agrees, at the request of Seller, from time to time (a) to deliver to Seller any or all Documents and (b) to execute and deliver to Seller any and all further instruments and documents, including, without limitation, separate assignments and financing statements, which Seller deems necessary or desirable to obtain the full benefits of the assignment, rights, interests and powers herein granted.

Buyer hereby grants to Seller the right (in Buyer's name or otherwise, and without affecting Buyer's obligations to Seller) during the continuance of an event of default under Paragraph 4: to demand, receive, compromise, extend the time of payment of, or give discharge for, any and all Revenues; to enforce any checks or other instruments or orders in connection with the Revenues; and to file any claims or take such actions or institute such proceedings as Seller may deem necessary or advisable to protect Seller's interest. Buyer shall have no authority during the continuance of an event of default under Paragraph 4 to, and will not, during such period of time without Seller's prior written consent, accept collections, repossess, substitute or consent to the return of the Property or modify the terms or provisions of the Documents.

## KOMATSU FINANCIAL

## SECURITY AGREEMENT – CONDITIONAL SALES CONTRACT

ACCOUNT NO.

Buyer agrees, upon the request of Seller, during the continuance of an event of default under Paragraph 4 (i) to notify all obligors under the Documents of the interest of Seller or its assigns, and (ii) to direct all obligors under the Documents to pay all Revenues directly to Seller. Buyer further agrees, upon request of Seller, to forward promptly to Seller all notices received by Buyer from any of the obligors under the Documents. Buyer agrees and warrants that: if required by Seller, all Leases shall provide that obligors under the Documents shall waive all rights to any defenses, set-offs and counterclaims as against Seller; if required by Seller, such leases shall acknowledge and agree (or the Lease shall provide) that lessee's rights to the Property are subject and subordinate to all of the terms of this Contract, including, without limitation, Seller's right to possession of the property after the occurrence of an event of default under this Contract; there are and will be no purchase option or rights of third persons in or to the property or the Additional Collateral, except as approved by Seller in writing; the property is and will remain personal property; and the property and the Additional Collateral are and will be free from all liens and encumbrances other than Seller's. Buyer further agrees that it will notify Seller upon learning of any material damage to or destruction of any of the property. Buyer will not remove the property or permit any lessee of the property to remove the property from those states where Seller has agreed in writing the property may be located. Buyer's chief executive office and principal place of business are at Buyer's address as set forth on pages 1 and/or 2 of the Contract unless otherwise set forth herein, and Buyer agrees to notify Seller promptly of any change of such address(es). Buyer shall cause each lessee of property to permit Seller to visit and inspect the property on such lessee's premises or on any other premises where such lessee has control. Buyer warrants, represents and covenants that (i) Buyer's true and correct legal name is as set forth on page 1 of this Contract and (ii) Buyer will not do any of the following without prior written notice to Seller; change its legal name, merge or consolidate with or into any other entity, change its type of business organization or change the jurisdiction of its organization.

**8. Insurance and Risk of Loss:** Liability insurance coverage for bodily and property damage caused to others is NOT included herein.

All risk of loss or damage to or destruction of the property shall at all times be on Buyer. Buyer will procure forthwith and maintain fire and theft insurance with extended or combined additional coverage on the property for the full insurable value thereof for the life of this contract plus such other insurance as Seller may specify, and promptly deliver each policy to Seller with a standard long form endorsement attached showing loss payable to Seller or assigns as respective interests may appear. Seller's acceptance of policies in lesser amounts of risks shall not be a waiver of Buyer's foregoing obligation. In the event that the property damage insurance required hereby shall be issued through the Agency as provided in the Insurance Coverage section on the second page of this Contract (such insurance obtained through the Agency, the "Insurance") and any portion of the cash down payment and trade-in equipment allowance set forth in the Trade-in Equipment Description section of the second page of this Contract shall be allocated to the payment of the premium for the insurance indicated in section 5c of the first page of this Contract, Seller agrees that the portion of the Cash and Trade-in allowance to be allocated to the payment of the premium on the insurance shall constitute monies to be paid by Seller on behalf of Buyer to pay such premium. Buyer directs that such portion of such cash down payment and allowance be used by Seller to promptly pay on behalf of Buyer the premium on the insurance. Buyer acknowledges that (i) Buyer has the option of furnishing the insurance required by this Section 8 through an agent or insurer of Buyer's choice and (ii) Seller merely informed Buyer of an insurance agent which deal with insurance of the type required by this Contract and asked Buyer in completing the application form for the insurance. Buyer agrees that Seller may from time to time communicate directly with the Agency and the insurer with respect to the Insurance. As additional security for the payment of the indebtedness owing by Buyer under this Contract, Buyer hereby grants to Seller a first priority security interest in the Insurance and all rights of Buyer with respect to the Insurance (including, without limitation, the right to cancel the insurance and all rights to Buyer relating to unearned premiums and dividends which may be payable on or in respect of the insurance).

Buyer represents, warrants and agrees that it has not heretofore assigned or transferred and will not assign or transfer any or all of its interest in the insurance, except in favor of Seller. In addition to any and all other rights and remedies available to Seller under this Contract, applicable law or otherwise, upon and after the occurrence of an event of default under this Contract, Buyer agrees that Seller may cancel the insurance and receive on behalf of Buyer the unearned insurance premium and dividends thereon. Such unearned insurance premium and dividends shall be applied by Seller to the payment of the amounts owing by Buyer to Seller under this Contract (and Buyer so directs that Seller make such application). Buyer hereby constitutes and appoints Seller as Buyer's attorney-in-fact with full authority upon and after the occurrence of an event of default under this Contract to cancel the insurance, to receive (and give receipt for) monies payable with respect to the insurance as a result of such cancellation and to endorse Buyer's name on any check, draft, or other form of payment for all monies that may become due from the insurer with respect to any such cancellation.

The foregoing power of attorney, being coupled with an interest, is irrevocable until all obligations of Buyer under this Contract have been paid in full. Buyer hereby releases Seller of any liabilities, claims, demands, obligations, costs and expenses now or hereafter incurred by Buyer in any way relating to the insurance, except for the failure of Seller to make the payment on the insurance premium with respect to the insurance as provided above and except for the gross negligence or willful misconduct of Seller. Seller assumes no liability as an insurer. Buyer acknowledges and agrees that the insurer and the Agency may conclusively rely on the agreements made by the Buyer in this Contract (including, without limitation, the direction of Buyer to Seller to pay on behalf of Buyer all or a portion of the insurance premium on the insurance, the right of Seller to communicate from time to time directly with the Agency and insurer and the power of attorney herein provided in favor of Seller in order to cancel the insurance) and shall have no liability to Buyer for relying on this Contract (including, without limitation, with respect to such power of attorney). Buyer acknowledges that neither the insurer nor the Agency shall be required to determine whether an event of default exists under this Contract in order to honor such power of attorney and the insurer and the Agency may conclusively rely on any statement given by Seller with respect to any such cancellation.

**9. Miscellaneous:**

Buyer waives all exemptions. Seller may correct patent errors herein and fill in such blanks as serial numbers, date of first payment and the like. Any provisions hereof contrary to, prohibited by, or invalid under applicable laws or regulations shall be inapplicable and deemed omitted herefrom, but shall not invalidate the remaining provisions hereof. Buyer acknowledges receipt of a true copy and waives acceptance hereof. "Buyer" and "Seller" as used in this contract also mean "debtor" and "secured party" respectively and include heirs, executors, or administrators, successors or assigns to those parties. If more than one Buyer executes this contract, their obligations under this contract shall be joint and several. Buyer acknowledges and agrees that the original contract shall not be returned to Buyer upon payment in full of all amounts owing under this contract, except as required by applicable law or as agreed to by Seller in its discretion.

ORIGINAL FOR SELLER (IF ASSIGNED, FOR KOMATSU FINANCIAL LIMITED PARTNERSHIP)   Buyer's Initials

**KOMATSU
FINANCIAL**

### SELLER'S ASSIGNMENT

TO:   KOMATSU FINANCIAL LIMITED PARTNERSHIP
Re:   Security Agreement/Contract between GRASS CREEK COAL COMPANY ("Buyer") and undersigned
("Assignor"), dated 02/23/2012 having a present unpaid balance of $133,816.32 covering PC300LC-8
S/N A90548 (hereinafter referred to as "Agreement").

For value received Assignor hereby sells and assigns to Komatsu Financial Limited Partnership, its successors and assigns
("Assignee"), the Agreement, together with all of Assignor's right, title and interest in the property covered by and described in the
Agreement ("Property"), and all of Assignor's rights and remedies thereunder and under any guaranty or endorsement thereof,
including the right to collect any and all installments due and to become due on the Agreement and to take, in Assignor's or
Assignee's name, any and all proceedings Assignor might otherwise take.

Assignor agrees that Assignee may audit its books and records relating to all paper assigned to Assignee and may in Assignor's
name endorse all accompanying notes and all remittances received, and Assignor gives express permission to Assignee to release,
on terms satisfactory to Assignee, by operation of law or otherwise, or to compromise or adjust any and all rights against and grant
extensions of time of payment to the Buyer or any other persons obligated on the Agreement or on any accompanying note or
guaranty, without notice to Assignor and without affecting Assignor's liability hereunder. Assignor waives presentment and demand for
payment, protest and notice of non-payment and protest as to all paper heretofore, now or hereafter endorsed or assigned to
Assignee and Assignor subordinates to any rights Assignee may now or hereafter have against the Buyer any rights Assignor may
now or hereafter have.

Assignor shall have no authority to, and will not, without Assignee's prior written consent, accept collections, repossess or consent to
the return of the Property described in the Agreement or modify the terms of the agreement or of any accompanying note or guaranty.
Assignee's knowledge at any time of any breach of or noncompliance with any of the foregoing shall not constitute any waiver by
Assignee. Assignor waives notice of acceptance hereof.

As part of the foregoing instrument, the Assignor's obligations in addition to those stated in the preceding paragraphs are governed by
paragraph 1, 2, 3 or 4 as indicated by the box marked X below.

[X]   **1. WITHOUT RECOURSE**
Assignor further agrees to assign the Agreement without recourse as to the financial ability of the Buyer to pay.

[ ]   **2. WITH RECOURSE**
Subject to the terms and provisions of any applicable underlying agreement between Assignor and Assignee, Assignor further
agrees to guaranty the payment promptly when due of the amount of each and every installment payable under the Agreement
and the payment on demand of the entire unpaid balance at the date of default in the event of any default by Buyer under the
Agreement, without first requiring Assignee to proceed against Buyer or any other person or any security.

[ ]   **3. LIMITED REPURCHASE AGREEMENT**
Assignor further agrees that if the Buyer fails to pay the first installments of his obligation within 15 days of scheduled maturity as
set forth in the Agreement hereby assigned and if any of said installments are not paid within the 15 days and Assignee
repossesses the Property described in said Agreement, Assignor will purchase from Assignee the Property for the then unpaid
balance in its then condition and location.

[ ]   **4. PARTIAL REPURCHASE AGREEMENT**
Assignor further agrees that if Assignee repossesses the Property described in said Agreement the undersigned upon demand
will pay to Assignee NaN or purchase the Property from Assignee for the then unpaid balance in its then condition and location.

MODERN MACHINERY CO., INC.
_____
(Assignor)

By: _____

Jacqueline Katrein
Controller

02/23/2012
(executed)

The above assignment is made subject to the terms and conditions of the financing agreement presently in effect between Assignor
and the Assignee, which specifically sets forth all of the rights and obligations of the Assignor and the Assignee with respect to retail
contracts, and incorporates without limitation, the representations and warranties made by Assignor to Assignee with respect to retail
contracts, any accompanying notes, guaranty or other documents relating thereto. Assignor represents to Assignee that (i) the
present unpaid balance under the Agreement is correct and (ii) Assignor will comply with all its obligations under the Agreement.

KF521R (11/01)

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Phone: 800-331-3282 Fax: 818-662-4141

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

CT Lien Solutions
P.O. Box 29071
Glendale CA, 91209-9071

32122332

WYOM

11323 -

File with: Secretary of State, WY

CT Lien Solutions
Representation of filing

This filing is Completed
File Number : 2012-49849752
File Date : 01-MAR-2012

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| | 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|---|
| OR | GRASS CREEK COAL COMPANY | | | | | |
| | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2223 Hwy 310, PO Box 876 | LOVELL | WY | 82431 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | CORPORATION | WY | 2004-000466021 | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names**

| | 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|---|
| OR | | | | | | |
| | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)**

| | 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|---|
| OR | Komatsu Financial Limited Partnership | | | | | |
| | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1701 W Golf Road, Suite 1-300 | Rolling Meadows | IL | 60008 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**
ONE (1) Komatsu PC300LC-8 Hydraulic Excavator, S/N# A90548, Equip # 24033 w/ 48" Bucket. COMPLETE WITH ALL PRESENT ATTACHMENTS, ACCESSORIES, REPLACEMENT PARTS, ADDITIONS AND ALL PROCEEDS THEREOF.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

| 8. OPTIONAL FILER REFERENCE DATA | | |
|---|---|---|
| 32122332 | New Filing (Rapport) | A90548 |

Prepared by CT Lien Solutions [3.23.0]

FILING OFFICE COPY - UCC FINANCING STATEMENT (FORM UCC1)   (REV. 05/22/02)

<u>EXHIBIT B</u>
(SGC Loan Agreement)

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "**Agreement**"), dated as of this _14th_ day of _October 2014____, is made by and between Grass Creek Coal Company, a Wyoming corporation (the "**Debtor**"), with an address at P.O. Box 876 Highway 310 Lovell, WY 82431 and Spring Gulch Coal Company, a Wyoming Corporation (the "**Secured Party**"), with an address at P.O. Box 628 Riverton, WY 82501.

Under the terms hereof, the Secured Party desires to obtain and the Debtor desires to grant the Secured Party security for all of the Obligations (as hereinafter defined).

**NOW, THEREFORE**, the Debtor and the Secured Party, intending to be legally bound, hereby agree as follows:

### 1. Definitions.

(a)   "**Collateral**" shall include the Debtor's tangible personal property, fixtures, leasehold improvements, trade fixtures, equipment and other personal property described on Exhibit "A" attached hereto and made a part hereof (the "**Personal Property**"); all general intangibles relating to or arising from the Personal Property, all cash and non-cash proceeds (including insurance proceeds) of the Personal Property, all products thereof and all additions and accessions thereto, substitutions therefor and replacements thereof.

(b)   "**Collateral Assignment**" means that certain Collateral Assignment of Lessee's Leasehold Interest in Lease, dated as of the date hereof, made by Debtor, as assignor, for the benefit of Secured Party, as assignee.

(c)   "**Loan Documents**" means the Note (as hereafter defined), the Collateral Assignment, this Agreement and all other documents and instruments evidencing, securing or executed in connection therewith.

(d)   "**Note**" means that certain Promissory Note, dated as of the date hereof, made by Debtor, for the benefit of Secured Party, in the original principal amount of $_100,000.00_   (e)   "**Obligations**" shall include all debts, liabilities, obligations, covenants and duties owing from the Debtor to the Secured Party of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Debtor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether evidenced by or arising under the Note or this Agreement or, whether absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, and all costs and expenses of the Secured Party incurred in the enforcement, collection or otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses.

(f)   "**UCC**" means the Uniform Commercial Code, as adopted and enacted and as in effect from time to time in the State of Wyoming Terms used herein which are defined in the UCC and not otherwise defined herein shall have the respective meanings ascribed to such terms in the UCC.

### 2. Grant of Security Interest.  To secure the Obligations, the Debtor, as debtor, hereby assigns and grants to the Secured Party, as secured party, a continuing lien on and security interest in the Collateral.

### 3. Change in Name or Locations.  The Debtor hereby agrees that if the location of the Collateral changes from the locations listed on Exhibit "A" hereto and made part hereof, or if the Debtor changes its name or form or jurisdiction of organization, or establishes a name in which it may do business, the Debtor will immediately notify the Secured Party in writing of the additions or changes.  The Debtor's chief executive office is listed in the Notice section below.

### 4. Representations and Warranties.  The Debtor represents, warrants and covenants to the Secured Party that:  (a) the Debtor has good, marketable and indefeasible title to the Collateral, has not made any prior sale, pledge, encumbrance, assignment or other disposition of any of the Collateral, and the Collateral is free from all encumbrances and rights of setoff of any kind except the lien in favor of the Secured Party created by this Agreement; (b) except as herein provided, the Debtor will not hereafter without the Secured Party's prior written consent sell, pledge, encumber, assign or otherwise dispose of

1

any of the Collateral or permit any right of setoff, lien or security interest to exist thereon except to the Secured Party; and (c) the Debtor will defend the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein.

**5. Debtor's Covenants.** The Debtor covenants that it shall:

(a) from time to time and at all reasonable times allow the Secured Party, by or through any of its officers, agents, attorneys, or accountants, to examine or inspect the Collateral and obtain valuations and audits of the Collateral, at the Debtor's expense, wherever located. The Debtor shall do, obtain, make, execute and deliver all such additional and further acts, things, deeds, assurances and instruments as the Secured Party may require to vest in and assure to the Secured Party its rights hereunder and in or to the Collateral, and the proceeds thereof, including waivers from landlords, warehousemen and mortgagees;

(b) keep the Collateral in good order and repair at all times and immediately notify the Secured Party of any event causing a material loss or decline in value of the Collateral, whether or not covered by insurance, and the amount of such loss or depreciation;

(c) only use or permit the Collateral to be used in accordance with all applicable federal, state, county and municipal laws and regulations; and

(d) have and maintain insurance at all times with respect to all Collateral against risks of fire (including so-called extended coverage), theft, sprinkler leakage, and other risks (including risk of flood if any Collateral is maintained at a location in a flood hazard zone) as the Secured Party may reasonably require, in such form, in the minimum amount of the outstanding principal of the Note and written by such companies as may be reasonably satisfactory to the Secured Party. Each such casualty insurance policy shall contain a standard Lender's Loss Payable Clause issued in favor of the Secured Party under which all losses thereunder shall be paid to the Secured Party as the Secured Party's interest may appear. Such policies shall expressly provide that the requisite insurance cannot be altered or canceled without at least thirty (30) days prior written notice to the Secured Party and shall insure the Secured Party notwithstanding the act or neglect of the Debtor. Upon the Secured Party's demand, the Debtor shall furnish the Secured Party with evidence of insurance as the Secured Party may require. In the event of failure to provide insurance as herein provided, the Secured Party may, at its option, obtain such insurance and the Debtor shall pay to the Secured Party, on demand, the cost thereof. Proceeds of insurance may be applied by the Secured Party to reduce the Obligations or to repair or replace Collateral, all in the Secured Party's sole discretion.

(e) If any of the Collateral is, at any time, in the possession of a bailee, Debtor shall promptly notify Secured Party thereof and, if requested by Secured Party, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to Secured Party, that the bailee holds such Collateral for the benefit of Secured Party and shall act upon the instructions of Secured Party, without the further consent of Debtor.

**6. Negative Pledge; No Transfer.** The Debtor will not sell or offer to sell or otherwise transfer or grant or allow the imposition of a lien or security interest upon the Collateral or use any portion thereof in any manner inconsistent with this Agreement or with the terms and conditions of any policy of insurance thereon.

**7. Further Assurances.** Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of Debtor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Florida Uniform Commercial Code or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the Florida Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment, including, but not limited to (i) whether Debtor is an organization, the type of organization and (ii) any organization identification number issued to Debtor. Debtor agrees to furnish any such information to Secured Party promptly upon request. Debtor also ratifies its authorization for Secured Party to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

**8. Events of Default.** The Debtor shall, at the Secured Party's option, be in default under this Agreement upon the happening of any of the following events or conditions (each, an "**Event of Default**"): (a) a failure to pay any amount due under the Note or this Agreement within ten (10) days of

2

the date the same is due; (b) the failure by the Debtor to perform any of its other obligations under this Agreement within thirty (30) days of notice from Secured Party of the same; (c) falsity, inaccuracy or material breach by the Debtor of any written warranty, representation or statement made or furnished to the Secured Party by or on behalf of the Debtor; (d) an uninsured material loss, theft, damage, or destruction to any of the Collateral, or the entry of any judgment against the Debtor or any lien against or the making of any levy, seizure or attachment of or on the Collateral; (e) the failure of the Secured Party to have a perfected first priority security interest in the Collateral; or (f) any indication or evidence received by the Secured Party that the Debtor may have directly or indirectly been engaged in any type of activity which, in the Secured Party's discretion, might result in the forfeiture of any property of the Debtor to any governmental entity, federal, state or local.

9.  **Remedies.**  Upon the occurrence of any such Event of Default and at any time thereafter, the Secured Party may declare all Obligations secured hereby immediately due and payable and shall have, in addition to any remedies provided herein or by any applicable law or in equity, all the remedies of a secured party under the UCC.  The Secured Party's remedies include, but are not limited to, to the extent permitted by law, the right to (a) peaceably by its own means or with judicial assistance enter the Debtor's premises and take possession of the Collateral without prior notice to the Debtor or the opportunity for a hearing, (b) render the Collateral unusable, (c) dispose of the Collateral on the Debtor's premises, and (d) require the Debtor to assemble the Collateral and make it available to the Secured Party at a place designated by the Secured Party.  Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Secured Party will give the Debtor reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made.  The requirements of commercially reasonable notice shall be met if such notice is sent to the Debtor at least five (5) days before the time of the intended sale or disposition.  Expenses of retaking, holding, preparing for sale, selling or the like shall include the Secured Party's reasonable attorney's fees and legal expenses, incurred or expended by the Secured Party to enforce any payment due it under this Agreement either as against the Debtor, or in the prosecution or defense of any action, or concerning any matter growing out of or connection with the subject matter of this Agreement and the Collateral pledged hereunder.  The Debtor waives all relief from all appraisement or exemption laws now in force or hereafter enacted.

10.  **Payment of Expenses.**  At its option, the Secured Party may, but is not required to: discharge taxes, liens, security interests or such other encumbrances as may attach to the Collateral; pay for required insurance on the Collateral;  and pay for the maintenance, appraisal or reappraisal, and preservation of the Collateral, as determined by the Secured Party to be necessary.  The Debtor will reimburse the Secured Party on demand for any payment so made or any expense incurred by the Secured Party pursuant to the foregoing authorization, and the Collateral also will secure any advances or payments so made or expenses so incurred by the Secured Party.

11.  **Notices.**  All notices, demands, requests, consents, approvals and other communications required or permitted hereunder must be in writing and will be effective upon receipt.  Such notices and other communications may be hand-delivered, sent by facsimile transmission with confirmation of delivery and a copy sent by first-class mail, or sent by nationally recognized overnight courier service, to a party's address set forth above or to such other address as any party may give to the other in writing for such purpose.

12.  **Preservation of Rights.**  No delay or omission on the Secured Party's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Secured Party's action or inaction impair any such right or power.  The Secured Party's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Secured Party may have under other agreements, at law or in equity.

13.  **Illegality.**  In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

14.  **Changes in Writing.**  No modification, amendment or waiver of any provision of this Agreement nor consent to any departure by the Debtor therefrom will be effective unless made in a writing signed by the Secured Party, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on the Debtor in any case will entitle the Debtor to any other or further notice or demand in the same, similar or other circumstance.

3

**15.  Entire Agreement.**  This Agreement (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

**16.  Counterparts.**  This Agreement may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart.  Any party so executing this Agreement by facsimile transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

**17.  Successors and Assigns.**  This Agreement will be binding upon and inure to the benefit of the Debtor and the Secured Party and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Debtor may not assign this Agreement in whole or in part without the Secured Party's prior written consent and the Secured Party at any time may assign this Agreement in whole or in part.

**18.  Interpretation.**  In this Agreement, unless the Secured Party and the Debtor otherwise agree in writing, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to articles, sections (or subdivisions of sections) or exhibits are to those of this Agreement unless otherwise indicated.   Section headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  If this Agreement is executed by more than one Debtor, the obligations of such persons or entities will be joint and several.

**19.  Governing Law and Jurisdiction.**  This Agreement has been delivered to and accepted by the Secured Party and will be deemed to be made in the State of Maryland.  THIS AGREEMENT WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF WYOMING, EXCEPT THAT THE LAWS OF THE STATE WHERE ANY COLLATERAL IS LOCATED, IF DIFFERENT, SHALL GOVERN THE CREATION, PERFECTION AND FORECLOSURE OF THE LIENS CREATED HEREUNDER ON SUCH PROPERTY OR ANY INTEREST THEREIN.  The Debtor hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in Fremont Co., WY; provided that nothing contained in this Agreement will prevent the Secured Party from bringing any action, enforcing any award or judgment or exercising any rights against the Debtor individually, against any security or against any property of the Debtor within any other county, state or other foreign or domestic jurisdiction.  The Secured Party and the Debtor agree that the venue provided above is the most convenient forum for both the Secured Party and the Debtor.  The Debtor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Agreement.

**20.  WAIVER OF JURY TRIAL.**  EACH OF THE DEBTOR AND THE SECURED PARTY IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS.  THE DEBTOR AND THE SECURED PARTY ACKNOWLEDGE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

**(EXECUTION PAGE FOLLOWS)**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and date first above written.

WITNESS:
signed and delivered in the presence of:

DEBTOR:

Grass Creek Coal Company Corporation

Print Name: L.B. Kummerfeld
Secretary

By: _____
Name: Jim Kummerfeld
Title: President

SECURED PARTY:

Spring Gulch Coal Company Corporation

Print Name: Ruth Hillberry
Secretary

By: _____
Name: Darwin Hillberry
Title: President_____

5

Attachment
List of Collateral

2008 Komatsu PC 300LC-8
SN# A80035

2006 Cat 980H
SN# # JM500507

need Documentation
of value

6

## PROMISSORY NOTE

| $100,000.00 | October 3, 2014 | April 3, 2015 |
|---|---|---|
| Amount of Note | Date of Note | Due Date |

Jimmy H. Kummerfeld, President of Grass Creek Coal Company, whose address is P.O. Box 876, 2223 Highway 310, Lovell, WY 82431, the undersigned, (hereinafter collectively called "Maker") promises to pay to Spring Gulch Coal Company, a Wyoming Corporation, whose address is P.O. Box 628, Riverton, WY 82501 (hereinafter called "Lender"), or order, Payable at P.O. Box 628, Riverton, WY 82501 or such other place specified by Lender in writing, One Hundred Thousand and No/100 Dollars ($100,000.00) with interest thereon at the rate of five (5.0%) percent per annum from the date hereof until paid, payable as follow:

> One Hundred Thousand No/100 Dollars ($100,000.00) with interest, on or before six months from the Date hereof.

Upon the happening of any of the following events, each of which shall constitute a default hereunder, the Obligation of the Maker to Lender shall become immediately due and payable at the option of Lender:  (1) failure of any Obligor (which shall include each maker, endorser, surety and guarantor of this note) to perform any agreement hereunder or pay any obligation secured hereby when due;  (2) filing of any petition in bankruptcy by or against any Obligor; (3) application for appointment of a receiver for, making of a general assignment for the benefit of creditors by, or insolvency of any Obligor; or (4) an Event of Default under any assignment or mortgage executed in connection herewith.

Upon occurrence of any such event or at any time thereafter, Lender shall have the remedied of a secured party under Uniform Commercial Code of the State of Wyoming, or real estate laws, as applicable to the security.

All Obligators waive protest of this note.  If this note is not paid when due, all Obligors agree to pay all costs and expenses of collection, including reasonable attorneys' fees and legal expenses. Any demand upon or notice to Maker shall be sufficiently served for all purposes if personally delivered or placed in the mail addressed to the address shown above or such other address as may be shown on Lender's records.

10/14

PRESENTMENT for payment, demand, notice of dishonor, protest, notice of protest and any homestead or personal property exemption allowed by the constitutions or laws of any state are hereby waived by the undersigned. Failure by the holder hereof to exercise any option granted it hereunder shall not constitute a waiver of future rights. The term "undersigned" as used herein shall include all makers, co-makers, endorsers, sureties and guarantors hereof.

THERE will be no pre-payment penalty on this Note.

IF DEFAULT is made in the payment specified herein, or any part thereof, and such default shall continue for a period of 10 days, then the holder hereof may, at its option, declare the whole sum then remaining unpaid immediately due and payable.

MAKER

GRASS CREEK COAL COMPANY, a Wyoming Corporation

Jimmy H. Kummerfeld
President

ATTEST:

Lenora Kummerfeld
Secretary

-2-

10/14

# SECRETARY OF STATE

EDWARD F. MURRAY, III

# STATE OF WYOMING

BUSINESS DIVISION

State Capitol
200 West 24th Street
Cheyenne, WY 82002-0020

Phone 307-777-7311
Fax 307-777-5339
Email: UCC@wyo.gov

## UCC3 AMENDMENT

SEND ACKNOWLEDGEMENT TO:

SPRING GULCH COAL COMPANY
P.O. BOX 628
RIVERTON, WY 82501
USA

NAME & PHONE OF CONTACT
DARWIN HILLBERRY, 307-856-3322

Email

## DOCUMENT INFORMATION

| DOCUMENT ID | |
|---|---|
| 2015-59266640 | |
| FILING DATE | NUMBER OF ATTACHMENTS |
| 03/31/2015 10:47 AM | 0 |
| RECORD TYPE | |
| COLLATERAL - RESTATE | |

DOCUMENT ID OF ORIGINAL FINANCING STATEMENT
2014-58285234

OLD DOCUMENT ID OF ORIGINAL FINANCING STATEMENT

INITIAL FILING DATE OF ORIGINAL FINANCING STATEMENT
11/28/2014 02:13 PM

FILER REFERENCE

AMENDMENT (COLLATERAL CHANGE)  ☐ Deleted Collateral  ☐ Added Collateral  ☑ Restated Collateral  ☐ Assigned Collateral
2008 Komatsu 300 LC-8 Hydrolic Excavator VIN#A90548, Equipt #24033 w/48" bucket, complete will all present attachments, accessories, replacement parts

2006 Caterpillar 980 H VIN#JMS00502

## NAME OF SECURED PARTY(S) OF RECORD AUTHORIZING THIS AMENDMENT

☐ Debtor Is Authorizing This Amendment

ORGANIZATION'S NAME
SPRING GULCH COAL COMPANY, A WYOMING CORPORATION

INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                                    SUFFIX